**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DERRICK PHIPPS, et al.,**      ) | |
| ) | |
| Plaintiffs,      ) | |
| ) | |
| v.      ) | No. 07 C 3889 |
| ) | |
| **SHERIFF OF COOK COUNTY, AND COOK**      ) | |
| **COUNTY, ILLINOIS,**      ) | |
| ) | |
| Defendants.      ) | |
| ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Derrick Phipps ("Phipps"), Kevin House ("House"), Kenneth Courtney, ("Courtney"), and James Grant ("Grant") have brought a class action suit against the Sheriff of Cook County ("the Sheriff") and Cook County, Illinois ("the County") (together, "defendants"), alleging violations of section 202 of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794(a).[1]   The plaintiffs and each of the defendants have filed cross-motions for summary judgment.   For the reasons discussed below, all of the parties' motions are denied.

**I.**

The plaintiffs are paraplegics and partially-paralyzed pre-trial detainees currently and formerly housed at the Cook

---

[1]The plaintiffs' amended complaint also asserted a claim under 42 U.S.C. § 1983.

County Department of Corrections ("CCDC" or "the Prison") since July 1995.  All were assigned to one of two facilities within the CCDC -- the Residential Treatment Unit ("RTU") or Cermak Health Services ("Cermak").[2]  In their amended complaint, the plaintiffs allege that the defendants discriminated against them by failing to provide them with wheelchair-accessible toilets, sinks, and shower facilities.  They claim to have suffered various injuries as a result of the alleged discrimination, including bed sores, rashes, and infections resulting from an inability to maintain proper hygiene.  They also claim to have sustained injuries from falling while attempting to transfer from their wheelchairs to toilet seats, beds, and shower chairs in various areas of the Prison. Finally, certain of the plaintiffs additionally allege that they were denied access to electronic monitoring and drug rehabilitation programs run by the CCDC.

## II.

### A.   Legal Standard

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue for trial exists "if the evidence is such that a reasonable jury could return

---

[2] Cermak serves as the CCDC's hospital and provides inmates with medical and psychiatric care.

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quotation marks omitted). Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). All facts must be construed in the light most favorable to the non-movant, and all justifiable inferences must be drawn in the non-movant's favor. *Anderson*, 477 U.S. at 255.

Because each of the parties has filed a separate motion for summary judgment, it may be helpful before proceeding to briefly summarize their basic contentions. The plaintiffs argue that the defendants were required by both the Rehabilitation Act and the ADA to provide disabled detainees with accessible toilets, showers, and sinks. Specifically, the plaintiffs claim that toilets in the facilities should be stationed at an appropriate height; equipped with rear and side "grab bars"; surrounded by a sufficient amount of open space to allow them to maneuver in their wheelchairs; and fitted with accessible flush valves. Without these modifications,

the plaintiffs claim that it is difficult for them to transfer between their wheelchairs and the Prison's toilets, and to sit on the toilets without falling.

The plaintiffs further claim that the defendants were required to provide them with sinks that are accessible in height, that have properly-installed fixtures, and that allow enough "knee space" for disabled individuals to approach the sinks from a forward direction in their wheelchairs.  As for the showers, the plaintiffs claim that the nozzle and control knobs must be located no higher than forty-eight inches above the floor, and that wheelchair-bound detainees must be provided with appropriate shower chairs. According to the plaintiffs, the defendants refused to implement any of these modifications, even though the changes would not have been unduly burdensome.

The County advances three central arguments in support of its motion for summary judgment: (1) that the plaintiffs' Rehabilitation Act claim fails because the defendants are not recipients of federal funds; (2) that the plaintiffs' ADA claim fails because showering and lavatory use do not qualify as "programs" or "activities" covered by the ADA; and (3) the plaintiffs' ADA claim fails because they have failed to allege intentional discrimination.

The Sheriff's motion for summary judgment advances four basic arguments: (1) that the suit is barred by the Prison Litigation

-4-

Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e, because the plaintiffs failed to exhaust administrative remedies before filing the instant suit; (2) that the suit is barred by the PLRA because the plaintiffs failed to allege any physical injuries as a result of the alleged discrimination; (3) that the plaintiffs' ADA claim fails  because, while the plaintiffs purport to assert the claim under Title II of the statute, violations of the type they allege are redressible only under Title III; and (4) that the defendants' failure to accommodate the plaintiffs was reasonable in light of the Prison's need to maintain institutional security.[3]

As can be seen, the parties' arguments center around three basic statutes -- the PLRA, the RA, and the ADA.  The discussion that follows is organized around these statutes, first examining the arguments raised under the PLRA, then moving on to the arguments arising under the RA, and finally discussing the arguments based on the ADA.  Before concluding, I also briefly examine the plaintiffs' claims concerning access to drug and monitoring programs.

### III.  The PLRA

Congress passed the PLRA as part of an "effort to address the large number of prisoner complaints filed in federal court." *Jones*

---

[3] Although the defendants make these arguments separately in their respective briefs, they end up adopting most of each other's arguments.  As a result, I generally discuss the defendants' arguments without regard to whether they were originally advanced by the County or the Sheriff.

*v. Bock*, 549 U.S. 199, 202 (2007).   The purpose behind the legislation was to reduce the number of suits brought by prisoners by separating meritorious claims from frivolous ones.  *Id.* at 204. The defendants claim that the plaintiffs' suit is barred by two of the PLRA's requirements: (1) that plaintiffs exhaust available administrative remedies prior to filing suit; and (2) that the plaintiffs may not seek to recover for psychological and emotional injuries without asserting prior physical injury.  Neither of these arguments is persuasive.

## A.    Exhaustion of Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Pavey v. Conley*, 544 F.3d 739, 740-41 (7th Cir. 2008).  The Sheriff claims that the plaintiffs were required under the PLRA to avail themselves of the Prison's grievance procedure before filing the current suit.  He claims that the plaintiffs failed to do so, and that, as a result, the suit must be dismissed.  This argument fails for several reasons.

As an initial matter, the argument has been forfeited.  In *Jones*, the Supreme Court held that a party's failure to exhaust administrative remedies must be asserted as an affirmative defense.

-6-

549 U.S. at 211-12.  An affirmative defense is waived if it is not asserted in a party's answer or in a subsequent motion to dismiss. *See* Fed. R. Civ. P. 8(c); *see also Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999).  Here, the Sheriff has raised the failure-to-exhaust claim for the first time in his motion for summary judgment.  As a result, the argument has been waived.  *See, e.g., Venters v. City of Delphi*, 123 F.3d 956, 968 (7th Cir. 1997); *Baker v. Chicago Fire & Burglary Detection, Inc.*, 489 F.2d 953, 955 (7th Cir. 1973); *MCI Telecomm. Corp. v. Ameri-Tel, Inc.*, 852 F. Supp. 659, 666 (N.D. Ill. 1994) (affirmative defense raised for first time in response to summary judgment motion was waived); *see also Simmons v. Ellena*, No. 96 C 6797, 2002 WL 31176161, at *2 (N.D. Ill. Sept. 30, 2002) (defendants waived failure-to-exhaust argument under PLRA by failing to raise it as an affirmative defense).[4]

Even if the argument had not been forfeited, however, the defendants' appeal to the PLRA is unsuccessful on the merits.

---

[4] It is true that courts have sometimes allowed affirmative defenses to be raised for the first time in summary judgment motions where the defendant has not first filed an answer, *see, e.g., Nobles v. Discover Fin. Servs., Inc.*, No. 02 C 2446, 2004 WL 1197417, at *2 (N.D. Ill. May 28, 2004), or where the opposing party would not be prejudiced by the delay, *see, e.g., Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009).  Here, however, the defendants answered before filing their summary judgment motion, *see* Doc. #19 (9/14/2007), and they have made no argument that asserting the defense at this stage of the litigation would not be prejudicial to the plaintiffs.  Indeed, the Sheriff appears to concede that the argument has been forfeited, since he offers no response to the plaintiffs' argument on this point.

First, the defendants have not convincingly shown that the PLRA even applies to this suit.  The PLRA defines the term "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h)).  In order to determine whether a plaintiff is a "prisoner confined in jail" for purposes of the PLRA, the court must look to the plaintiff's status at the time he initiates his suit.  *See, e.g.*, *Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004); *see also Ahmed v. Dragovich*, 297 F.3d 201, 210 (3d Cir. 2002) (noting that "every court of appeals to have considered the issue has held that the PLRA does not apply to actions filed by former prisoners"); *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) (per curiam) ("[W]e hold that litigants . . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision.").

In this case, it is undisputed that Phipps and House had been released at the time the suit was filed.  *See* Defs.' Resp. Pls.' 56.1(a) Stmt. ¶¶ 1,2; Pls.' Opp. to Defs.' Summ. J. at 13 n.11.  Hence, at the very least, Phipps's and House's claims are not subject to, or barred by, the PLRA.  In light of this fact, it is

unclear whether it remains incumbent upon other members of the plaintiff class to exhaust their administrative remedies.

Even if the exhaustion requirement were applicable to remaining class members, however, the defendants have failed to show that the requirement has not been met. It is undisputed, for example, that Courtney filed a grievance to complain about the Prison's conditions. The defendants argue that Courtney's grievance does not count for purposes of the exhaustion requirement because the suit was filed before his grievance was denied. They further contend that Courtney's grievance was deficient for failing to allege that he suffered from physical injury. However the record is not sufficiently clear about the way in which the grievance procedure operated in this case.

For example, Courtney first filed a document with the CCDC on November 28, 2006 -- long before the suit was filed -- complaining that he needed a shower chair. According to the defendants, this was deemed a "request" by the CCDC. Defs.' 56.1(a) Stmt. ¶ 50. The defendants further explain that prisoners may not appeal from the denial of requests; instead, if a prisoner disagrees with the Prison's response to his request, he may "resubmit the concern" and it will then be treated as a grievance. *Id.* However, while the defendants characterize Courtney's initial filing as a request, the plaintiffs claim that it was a grievance. Indeed, the form initially submitted by Courtney bore the title, "Cook County

-9-

Department of Corrections Detainee Grievance." Pls.' Ex. 31. The defendants do not fully explain why Courtney's initial filing should not have been deemed a grievance. They explain the difference between a request and a grievance, but they do not completely explain why Courtney could not have been regarded as having filed a grievance rather than a request. If the CCDC improperly processed the first form submitted by Courtney as a "request" instead of a grievance, Courtney's apparent failure to comply with the Prison's grievance procedure would not have been his fault, and would not be precluded by the PLRA. *See, e.g.*, *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) ("[A plaintiff] must exhaust only those administrative remedies that are available to him. The Eighth and Fifth Circuits have deemed administrative remedies exhausted when prison officials fail to respond to inmate grievances because those remedies had become "unavailable." . . . . We join the Eighth and Fifth circuits on this issue because we refuse to interpret the PLRA so narrowly as to permit prison officials to exploit the exhaustion requirement through indefinite delay in responding to grievances.") (citations, quotation marks, brackets, and ellipsis omitted).

Furthermore, in the class action context, many courts have adopted a theory of "vicarious exhaustion," under which the PLRA's exhaustion requirement will be deemed satisfied for the entire class so long as the requirement has been met by at least one class

member.  *See Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) ("We hold that a class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion,' i.e., when 'one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class.'") (quoting *Jones v. Berge*, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001)).  Although the Seventh Circuit has not specifically addressed the question, many courts have accepted the vicarious exhaustion theory.  *See, e.g., Meisberger v. Donahue*, 245 F.R.D. 627, 629 (S.D. Ind. 2007)(collecting cases).[5]  As previously observed:

> [I]n the PLRA context, the purpose of affording prison officials an opportunity to address complaints internally is met when one plaintiff in a class action has exhausted his administrative remedies.  To require each inmate with the same grievance to exhaust their administrative remedies would be wasteful, and as long as prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons.

*Lewis v. Washington*, 265 F. Supp. 2d 939, 942 (N.D. Ill. 2003) (brackets and quotation marks omitted).

---

[5] While some courts appear to suggest that the vicarious exhaustion doctrine should apply only where a class has been certified under Rule 23(b)(2), *see, e.g., Hattie v. Hallock*, 8 F. Supp. 2d 685, 689 (N.D. Ohio 1998), others have found vicarious exhaustion where, as here, the class has been certified under Rule 23(b)(3), *see, e.g., Rahim v. Sheahan*, No. 99 C 0395, 2001 WL 1263493, at *8 (N.D. Ill. Oct. 19, 2001) (Schenkier, Mag. J.).

Applying vicarious exhaustion here, if any single member of the plaintiff class exhausted the available remedies, the entire class can be deemed to have done so. Since the failure-to-exhaust argument is an affirmative defense, the burden is on the defendants to prove it. *See, e.g.*, *Salas v. Wisconsin Dept. of Corr.*, 493 F.3d 913, 922 (7th Cir. 2007)("A plaintiff's failure to exhaust administrative remedies is an affirmative defense, which is the defendant's burden to prove."). Here, however, the defendants have not asserted, much less shown, that none of the class members has exhausted the available administrative remedies. For this reason, too, the Sheriff's PLRA argument fails.

## B.  Physical Injury

The defendants' second argument under the PLRA claims that the plaintiffs' suit is precluded because they have not alleged physical injuries. The PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(h). The defendants point out that the plaintiffs' allegations of discrimination form the basis for their suit. According to the defendants, the harm caused by discrimination is mental and emotional in nature, not physical. As a result, they argue, in alleging discrimination, the plaintiffs

have alleged only mental and emotional injury.  Consequently, they conclude that the plaintiffs' suit is precluded by the PLRA.

Like the previous argument, the defendants' physical injury argument fails for multiple reasons.  To begin with, the PLRA's physical injury requirement, like the exhaustion requirement, does not apply to individuals who were not prisoners at the time the litigation was initiated.  The statute's plain language makes clear that it applies only to suits brought by prisoners confined in a jail or correctional facility.  As the Seventh Circuit has explained:

> A "prisoner" cannot bring an action for mental injury unless he has suffered physical injury too. Just in case anyone might be tempted to equate "prisoner" with "ex-prisoner" -- to think that "prisoner" refers to the plaintiff's status at the time of the injury rather than at the time the litigation begins -- the statute says that its object is a "prisoner confined in a jail, prison, or other correctional facility". . . .  The statutory language does not leave wriggle room; a convict out on parole is not a "person incarcerated or detained in any facility who is ... adjudicated delinquent for, violations of . . . the terms and conditions of parole" . . . . So by waiting until his release from prison Kerr avoided § 1997e(e).  And a distinction between current and former prisoners makes a modicum of sense: Congress deemed prisoners to be pestiferous litigants because they have so much free time on their hands and there are few costs to filing suit. Opportunity costs of litigation rise following release, diminishing the need for special precautions against weak suits.

*Kerr v. Puckett*, 138 F.3d 321 (7th Cir. 1998) (citations omitted); *see also Harris v. Garner*, 216 F.3d 970, 975 (11th Cir. 2000).  As noted above, neither Phipps nor House was a "prisoner" at the time

this action was filed.  At the very least, therefore, the PLRA would not preclude Phipps's and House's claims, or the claims of other class members who were not incarcerated at the time the suit was filed.

The deeper problem with the defendants' argument, however, is that it rests on a faulty premise -- namely, that the plaintiffs have failed to assert physical injuries.  The plaintiffs complain of bed sores, infections, and injuries resulting from falling to the ground from their wheelchairs.  These injuries are undeniably physical.  The fact that the plaintiffs have also alleged mental and emotional harm does not mean that they have run afoul of the PLRA.  The PLRA does not forbid any recovery for emotional and psychological harm; it merely forbids recovery for such injuries "without a prior showing of physical injury."  42 U.S.C. § 1997e(e).

The defendants further argue that the class definition makes no mention of physical injuries.  According to the Sheriff, this somehow shows that, by definition, the plaintiffs' suit does not seek recovery for physical harm.  This is unconvincing.  While the class definition does not specifically mention physical harm, it also does not explicitly mention emotional or psychological harm.  Nevertheless, the Sheriff concedes that the plaintiffs seek recovery for psychological and emotional injury.  On the defendants' own view, therefore, the mere fact that the class

-14-

definition does not specifically mention physical harm does not mean that the plaintiffs do not seek to recover for physical injury. And the plaintiffs' amended complaint directly contradicts any suggestion that the suit does not seek to recover for physical injuries. On the contrary, the complaint alleges that each of the named plaintiffs suffered physical injury.

In any event, even if the Sheriff's argument on this point were correct, it would show at most only that the class definition was inadequate. If that were true, it would be necessary only to alter the class definition; *see, e.g.*, *Gates v. Towery*, 456 F. Supp. 2d 953, 966 (N.D. Ill. 2006) ("[A]fter certifying a class, the Court retains broad power to modify the definition of the class if it believes that the class definition is inadequate."); it would not constitute grounds for awarding summary judgment in the defendants' favor.

Finally, the Sheriff contends that the plaintiffs fail to meet the PLRA's physical injury requirement because any physical injuries asserted by the plaintiffs are purely *de minimis*. According to the Sheriff, virtually all wheelchair-bound individuals suffer from bed sores and infections. He therefore insists that the plaintiffs would have sustained the injuries they complain of regardless of whether they were incarcerated. As a result, he argues, the plaintiffs cannot seek to recover for such injuries here.

-15-

In support of this claim, the Sheriff relies on the testimony of Colette Connolly, a clinical nurse specialist at Cermak, who stated that "99% of the people come to me with bed sores.  So they have already have had them before they already come into the facility."  Defs.' 56.1(a) Stmt. ¶ 32.  The defendants also cite Connolly's testimony that Cermak would not accept detainees who were unable to transfer into and out of their wheelchairs.  Defs.' 56.1(a) Stmt. ¶ 33.  Connolly further testified that she monitored all inmates to ensure that they were able to perform the necessary maneuvers.  Defs.' 56.1(a) Stmt. ¶¶ 31, 33.  In other words, since everyone admitted to Cermak has been found capable of adroitly operating his wheelchair, the defendants argue that the plaintiffs could not have sustained physical injuries from falling while incarcerated by the Prison.

I am not persuaded.  First, even if the plaintiffs had bed sores and rashes prior to entering the CCDC, it does not follow that the defendants bear no fault for sores and rashes that developed after the plaintiffs' incarceration.  Conditions in the CCDC may have aggravated the plaintiffs' conditions, making them much worse than ordinary, or reopening sores that otherwise would have healed.  Phipps and Courtney make precisely this claim, arguing that their bed sores were worsened by their inability to shower and maintain proper hygiene.  *See* Am. Compl. ¶¶ 6, 13.  The plaintiffs may also have developed a greater number of sores and

other ailments than would have been the case if they had not been incarcerated. Further, Connolly's testimony does not provide a sufficient basis for the Sheriff's claims. For one thing, the plaintiffs dispute her claim that detainees entering the Cermak facility are tested for their ability to transfer from their chairs to beds, toilets, and the like. *See* Pls.' L.R. 56.1(b) Stmt. ¶ 33. Moreover, Connolly's testimony addresses only the Cermak facility and thus provides no basis for summary judgment insofar as the plaintiffs' claims are based on conditions existing in the RTU.

Nor, finally, do the cases cited by the defendants support their argument. Specifically, the Sheriff cites cases in which dizziness, headaches, insomnia, "stomach anxiety," and aggravated hypertension were found to be *de minimis*. However, these injuries are qualitatively different from the types of injury claimed by the plaintiffs here -- bed sores, rashes, and injuries caused by falling from chairs and toilets. Moreover, the extent of any particular injury is almost inherently a fact-specific matter. Some bed sores are more obviously severe than others. Thus, even if bed sores had been declared *de minimis* in other cases, it would not follow that the bed sores alleged by the plaintiffs here were

-17-

*de minimis*.[6]   In short, the plaintiffs' suit is not foreclosed by
the PLRA's physical injury requirement.

## C.   Summary

For the reasons discussed above, the defendants are not
entitled to summary judgment on the basis of the PLRA.   The
defendants have forfeited any appeal to the PLRA's exhaustion-of-
remedies requirement.   Even on the merits, however, the remedy-
exhaustion argument fails.   Since Phipps and House were not
incarcerated at the time the suit was filed, the requirement does
not apply to them.   Nor, to the extent that it is necessary for
other class members to satisfy the requirement, have the defendants
shown that the remaining plaintiffs have failed to do so.   In
particular, the defendants failed to address the question of
whether the requirement might have been met by means of vicarious
exhaustion.

The defendants' reliance on the PLRA's physical injury
requirement is similarly unavailing, both because the requirement
is clearly inapplicable to Phipps and other plaintiffs who were not
incarcerated when the suit was filed, and also because, in any

---

[6] In discussing these issues, the County also argues that the
individualized nature of the damages sought by the plaintiffs
"defies" the case's "class action status."   County's Br. at 12.
This issue has already been resolved in deciding the plaintiffs'
motion for class certification, *Phipps v. Sheriff of Cook County*,
No. 07-3889, slip op. at 7 (N.D. Ill. June 30, 2009), and will not
be revisited here.

event, the plaintiffs allege that they have suffered physical injuries.

## IV.  The Rehabilitation Act

I turn now to the defendants' arguments concerning the plaintiffs' Rehabilitation Act claim.  The RA provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.  29 U.S.C. § 794(a). Accordingly, in order to make out a prima facie case under the RA, a plaintiff must show: "(1) that he is a 'handicapped individual' under the Act, (2) that he is 'otherwise qualified' for the [benefit] sought, (3) that he was [discriminated against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." *Grzan v. Charter Hosp. of Nw. Indiana*, 104 F.3d 116, 119 (7th Cir. 1997) (alterations omitted).

With the exception of factor (4) singled out above -- i.e., the federal-funding requirement -- the elements of an RA claim are identical to those of an ADA claim. *See, e.g.*, *Jackson v. City of Chicago*, 414 F.3d 806, 811 n.2 (7th Cir. 2005).  For this reason, the parties' discussion of the RA turns entirely on whether the

defendants meet the federal-funding requirement.  The remaining elements of the RA claim are discussed in conjunction with the plaintiffs' ADA claim.  Both the Sheriff and the County assert that they do not receive federal funds.  As a result, both argue that they are not subject to the requirements of the RA, and that the plaintiffs' claim under the RA fails.  I disagree.

The County begins by arguing that, for purposes of the RA, it is not enough to show that the County receives federal funds; rather, the County contends that, in order to trigger liability under the RA, the federal funds must be received by the specific entity or department within the County that engaged in the alleged discrimination.  County's Br. at 6.  The County therefore goes on to assert that the CCDC does not receive federal funds, and that the RA's requirements accordingly do not apply here.

This argument is not supported by the record.  The defendants' Local Rule 56.1 Statement asserts: "The [CCDC] does not receive federal funds or federal financial assistance for programs or services under ADA for the Cook County Department of Corrections or any federal funds for the making of programs and services accessible to those qualified under the ADA."  Defs.' L.R. 56.1(a) Stmt. ¶ 4.  But the question is not whether the CCDC receives federal funds "for programs under the ADA" or for making programs and services "accessible to those qualified under the ADA." Rather, for purposes of the RA, the question is whether the program

or activity in question receives federal financial assistance, full stop.  *See* 29 U.S.C. 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under *any* program or activity receiving Federal financial assistance or under *any* program or activity conducted by any Executive agency or by the United States Postal Service.") (emphasis added).  Thus, even assuming the truth of the statements on which the County relies, the County still would not have shown that it is free from the RA's requirements.  The County must point to evidence that the CCDC receives no federal funds of any sort.

The Sheriff similarly argues that he is not subject to the RA's requirements on the ground that he receives no federal funds. This argument founders at the very outset because the defendants cite no evidence in support of this claim.  While the defendants' Local Rule 56.1 Statement mentions the CCDC -- and even specifically mentions the Cermak facility[7] -- it is silent on the question whether the Sheriff's Office receives federal funds.

---

[7] *See* Defs.' L.R. 56.1(a) Stmt. ¶ 5 (stating that Cermak "does not receive any federal funds or federal financial assistance for programs or services under ADA for the Cook County Department of Corrections or any federal funds for the making of programs and services accessible to those qualified under the ADA").

Even on its face, however, the Sheriff's claim is unpersuasive.  For example, in his brief, the Sheriff argues that the RA does not apply to him because the "Sheriff does not receive federal financial assistance for programs and services under the ADA."  Sheriff's Resp. at 3.  As with the CCDC, however, the fact that the Sheriff's Office does not receive federal funds "for programs and services under the ADA" is irrelevant: for purposes of the RA, it is not necessary that the federal funding be connected in any way with the ADA, or indeed with any other particular federal statute.

In the defendants' joint reply brief, the Sheriff makes a slightly different argument, contending that the RA applies only to "organizations" and "entities," and arguing that the RA does not apply to him because he is neither an organization nor an entity, but instead an "independently elected officer."  Defs.' Reply at 11.  This argument borders on sophistry.  By its plain language, the RA applies to "programs or activities" that receive federal financial assistance, not "organizations" or "entities." Moreover, the statute goes on to define "program or activity" as "any department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1)(A).  Under any natural reading, the Sheriff's Office incontrovertibly falls under this definition.

The defendants further claim that "the office of the sheriff has no authority to levy taxes or establish a budget and thus has no funds with which to finance its expenses.   Instead, the office of the sheriff is financed by public funds appropriated to it by the county board."   Reply Br. at 7.   But this argument is a *non sequitur*: the fact that the Sheriff's Office has no ability to raise its own funds obviously does not show that the Sheriff's Office receives no federal funds.   It is entirely possible, for example, that a portion of the public funds appropriated by the County Board for the Sheriff's Office might originate with the federal government.   In any event, the plaintiffs have submitted evidence indicating that the Cook County Sheriff's Office has received federal funds since at least 2003.[8]   Thus, like the County, the Sheriff has failed to show that he does not receive federal funds.   He therefore cannot claim that he is beyond the reach of the RA's requirements.

In sum, the defendants have failed to show that they are not recipients of federal funds.   Accordingly, I deny their motions for summary judgment on the plaintiffs' RA claim insofar as the motions

_____

[8] The plaintiffs offer this evidence as part of a motion to strike the Sheriff's assertions that he is not a recipient of federal funds.   The plaintiffs' evidence is sufficient to create a disputed question of material fact with respect to the RA's federal-funding requirement.   Since this is enough to defeat the Sheriff's motion for summary judgment as to the RA, formally striking the defendants' statements is unnecessary.   Accordingly, the motion to strike is denied.

-23-

rest on their claim that they do not meet the RA's federal funding requirement.

## V.   The ADA

### A.   The ADA Title II Framework

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 750 (7th Cir. 2006) (citing 42 U.S.C. § 12101(b)(1), (b)(4). The Act "forbids discrimination against persons with disabilities in three major areas of public life: (1) employment, which is covered by Title I of the statute; (2) public services, programs and activities, which are the subjects of Title II; and (3) public and private lodging, which is covered by Title III." *Id.* (citations omitted). It is now well-settled that prisons and correctional facilities are covered by Title II. *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998) (holding that the "plain text of Title II of the ADA unambiguously extends to state prison inmates").

In order to prove a violation of Title II, the plaintiff must show: "[1] that he is a 'qualified individual with a disability,' [2] that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and [3] that the denial or

discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132).   Moreover, Title II's implementing regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."   28 C.F.R. § 35.130(b)(7).

Both the plaintiffs and the defendants seek summary judgment on the plaintiffs' ADA claims.   The defendants argue, first, that the plaintiffs have failed to state a claim under the ADA as a matter of law because: (1) while their suit is premised on Title II of the ADA, the plaintiffs' claim is cognizable only under Title III; (2) showering, toileting, lavatory use, and other activities at issue in the case do not qualify as "programs" or "services" subject to ADA requirements; and (3) the plaintiffs fail to allege that they were subjected to intentional discrimination, which is necessary in order to recover compensatory damages under Title II. In addition to these arguments, the defendants contend that even if the plaintiffs were to succeed in stating a claim under the ADA, the suit would ultimately fail because the accommodations that the plaintiffs request are unreasonable.   On top of all of this, the

defendants have filed two motions to strike certain of the plaintiffs' filings.

For their part, the plaintiffs (in addition to attempting to rebut the defendants' arguments) contend that they seek only reasonable modifications of the showers, toilets, and sinks, and that in failing to make the modifications, the defendants violated the ADA.

I conclude that neither party is entitled to summary judgment on the plaintiffs' ADA claim: the defendants fail to show that they are entitled to summary judgment as a matter of law; and the central question concerning the reasonableness of making the plaintiffs' requested accommodations is much too fact-sensitive to be resolved on the basis of any of the parties' arguments.  These issues are examined below, beginning with the defendants' motion to strike.

## B.   Motions to Strike

As noted above, the defendants have filed two motions to strike.  The first of these seeks to strike the plaintiffs' Rule 56.1 Statement of Material Facts.  The second motion seeks to strike the report of Ken Schoonover ("Schoonover"), the plaintiffs' expert witness.  Both motions are denied.

In their motion to strike the plaintiffs' Rule 56.1 Statement, the defendants argue that the plaintiffs have violated Local Rule

56.1 in several ways: by combining several factual statements in a single paragraph; by asserting legal conclusions instead of factual claims; and by failing to support certain of their assertions with citations to the record.  *See* N.D. Ill. L. R. 56.1(a) ("The statement . . . shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). While certain of the plaintiffs' statements do suffer from one or more of these defects, the vast majority do not.  Thus, insofar as the defendants' motion seeks to strike the plaintiffs' Rule 56.1 Statement in its entirety, it is without merit.[9]  However, to the extent that certain of the plaintiffs' statements were properly objected to, I have not relied upon them in deciding the present matter.

The defendants' motion to strike Schoonovers' report is also denied.  In support of their motion, the defendants claim that the plaintiffs failed to timely disclose their intention to use Schoonever as an expert witness.  In addition, the defendants claim that the plaintiffs violated Fed. R. Civ. P. 26(a)(2) by virtue of

---

[9] It should be noted that many of the defendants' own statements suffer from the same errors as those they purport to identify in the plaintiffs' Rule 56.1 Statement.  *See, e.g.*, Defs.' 56.1 Statement of Facts ¶¶ 34, 35.

the fact that their attorney failed to sign Schoonever's expert report.  Neither of these contentions is persuasive.

To begin with, the plaintiffs point out that Schoonover's report was referenced in, and attached to, their motion for class certification -- which was submitted well before the deadline for disclosing expert witnesses.  As a factual matter, therefore, the defendants are incorrect in claiming that Schoonover and his report were not disclosed to them in a timely fashion.

It is true that Schoonever's report was not signed by plaintiffs' counsel, but -- despite defendants' protestations to the contrary -- no such thing is required under the Federal Rules of Civil Procedure.  Rule 26(g)(1) provides that "[e]very disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name."  However, expert disclosures are controlled by Rule 26(a)(2), which Rule 26(g)(1) specifically fails to mention.  Rule 26(a)(2) makes clear that the expert's report must be signed *by the expert*, not the attorney.  Fed. R. Civ. P.  26(a)(2) ("Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report -- prepared and signed *by the witness*[.]") (emphasis added).  Nor do this District's Local Rules contain any requirement that

expert reports be signed by counsel.  Accordingly, the motion to strike Schoonover's expert report is denied.[10]

## C.    Title II and Title III: Accommodation

As indicated earlier, the defendants argue on several grounds that the plaintiffs' ADA claim fails as a matter of law.  Their main argument on this point is that the claim fails because whereas the plaintiffs travel under Title II of the statute, violations of the type they allege are redressible only under Title III.  According to the defendants, the plaintiffs do not claim that they have been affirmatively denied access to the prison facilities in question, but instead seek the removal of existing physical barriers that prevent them from accessing the facilities.  The defendants argue that such "barrier removal" claims are cognizable only under Title III.  Because the plaintiffs' claims relate to prison conditions, however, they are covered by Title II.

The logic of this argument is elusive.  The defendants fail to cite any case authority for the proposition that barrier-removal claims are the province of the Title III and not Title II.  The

---

[10] The plaintiffs also have filed two motions to strike.  The first motion, which seeks to strike the Sheriff's statements that he does not receive federal funds, has already been addressed above in connection with the plaintiffs' RA claim.  The second motion seeks to strike various assertions included in the defendants' Rule 56.1 Statement.  It is unnecessary to discuss each of these statements individually.  Suffice it to say, once again, that in deciding this matter, I have not relied on any of the defendants' statements to which proper objection has been made.

defendants expend much energy in showing that Title III does not apply to prisons (an issue that no one disputes), and that Title III covers barrier-removal claims (another issue not in dispute here); however, the defendants do not show that claims for barrier removal can somehow be asserted *only* under Title III.

In point of fact, case authority is to the contrary.  Many courts have considered cases brought by prisoners under Title II seeking relief similar or identical to that sought here.  *See, e.g.*, *Kutrip v. City of St. Louis*, 329 Fed. App'x. 683, 684-85 (8th Cir. 2009); *Pierce v. County of Orange*, 526 F.3d 1190, 1220 (9th Cir. 2008) (district court erred in denying relief to challenge by mobility- and dexterity-impaired detainees to inaccessibility of prison's bathrooms, sinks, showers, and other fixtures); *Kiman v. New Hampshire Dept. of Corr.*, 451 F.3d 274, 288 (1st Cir. 2006); *Foster v. Morris*, 208 Fed. App'x 174 (3d Cir. 2006); *Armstrong v. Schwarzenegger*, No. C 94-2307 CW, 2009 WL 2997391, at *4-5 (N.D. Cal. Sept. 16, 2009); *Lee v. Sherrer*, No. 06-2716, 2009 WL 901777 (D.N.J. Mar. 31, 2009); *Cotton v. Sheahan*, No. 02 C 0824, 2002 WL 31409575, at *3 (N.D. Ill. Oct. 24, 2002) (Ashman, Mag. J.); *Schmidt v. Odell*, 64 F. Supp. 2d 1014, 1032 (D. Kan. 1999); *Kaufman v. Carter*, 952 F. Supp. 520, 532 (W.D. Mich. 1996).

In short, the fact that the plaintiffs seek to remove existing barriers that hinder their access to the prison's facilities, and the fact that their ADA claim is brought under Title II instead of

Title III, affords no basis for granting the defendants summary judgment.

## D.   Programs and Services

Next, the defendants argue that the plaintiffs' ADA claim fails because the statute requires a showing that the plaintiffs were denied the benefit of the "services, programs, or activities of a public entity."   42 U.S.C. § 12132.   According to the defendants, the facilities to which the plaintiffs claim to have been denied access -- showers, toilets, and sinks -- do not count as "services" or "programs" for purposes of the ADA.   This is simply incorrect.   The County cites two cases in support of its position -- *Crawford v. Indiana Dept. of Corr.*, 115 F.3d 481 (7th Cir. 1997), *abrogated on other grounds by Erickson v. Bd. of Governors of State Coll. and Univs for Northeastern Illinois Univ*, 207 F.3d 945 (7th Cir. 2000), and *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996).   These cases held only that sleeping and mere incarceration were not "programs" or "services" within the meaning of the ADA.   Neither decision suggests that showering, or using the sink or toilet, cannot be viewed as programs or services in the relevant sense.   On the contrary, the ADA prison condition cases cited above involved challenges to conditions identical or similar to those challenged here.   *See, e.g.,* *Pierce*, 526 F.3d at 1218 (toilets, sinks, showers, hot water dispensers, telephones, and water fountains); *Kutrip*, 329 Fed. App'x. at 684 (showering);

-31-

*Foster*, 208 Fed. App'x at 176 (access to showers and toilets); *Armstrong*, 2009 WL 2997391, at *4 (access to showers and bathrooms); *Lee*, 2009 WL 901777 at *2 (showering); *Cotton*, 2002 WL 31409575, at *3 (access to showers and visiting room); *Schmidt*, 64 F. Supp. 2d at 1032-33 (use of toilet, shower, recreational areas, and obtaining meals); *Kaufman*, 952 F. Supp. at 532 (access to shower, toilet, water fountain, and telephone).

In these cases, showering, toileting, and lavatory use were regarded as programs and/or services under the ADA.  The defendants have given no reason for departing from those cases here.

**E.   Intentional Discrimination**

The County next argues that the plaintiffs' ADA claim fails because the plaintiffs fail to allege that the defendants discriminated against them intentionally.  The defendants point out that a showing of intentional discrimination must be made in order to recover compensatory damages under the ADA.  They further note that the plaintiffs' complaint seeks only compensatory damages. The defendants therefore conclude that the plaintiffs' failure to allege intentional discrimination is fatal to their ADA claim.[11]

---

[11] The County further argues that even if the plaintiffs could be construed as requesting injunctive relief in addition to compensatory damages, the claim would be foreclosed by the consent decree entered by Judge Shadur in *Duran v. Elrod*, No. 74 C 2949 (N.D. Ill. 1974).  It is unnecessary to discuss that issue here, however, since the plaintiffs do not dispute the defendants' claim that the plaintiffs seek only compensatory damages.

The plaintiffs devote surprisingly little attention to rebutting this argument: they simply deny that it is necessary to show intentional discrimination to make out an ADA claim.  Rather, they contend, they need only show that, but for their disabilities, they would not have been discriminated against.  The plaintiffs are incorrect.  It is true that not all ADA claims require a showing of intentional discrimination.  *See, e.g.*, *Washington v. Indiana High School Athletic Ass'n, Inc.*, 181 F.3d 840, 846-47 (7th Cir. 1999) ("We cannot accept the suggestion that liability under Title II of the Discrimination Act must be premised on an intent to discriminate on the basis of disability . . . . In our view . . . discrimination under both [the RA and the ADA] may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.").

However, it is necessary to show intentional discrimination in order to recover compensatory damages (as opposed, say, to injunctive relief).  Title II of the ADA incorporates by reference the enforcement scheme found in section 505 of the Rehabilitation Act.  *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of

-33-

section 12132 of this title."). In turn, section 505 Rehabilitation Act, incorporates the remedies found in Title VI of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."). In *Guardians Assn. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582 (1983), the Supreme Court held that private individuals could recover compensatory damages under Title VI for intentional discrimination. *Id.* at 607 n.27.

As a result, courts have almost unanimously taken *Guardians* to mean that compensatory damages are similarly available under Title II of the ADA if -- and only if -- the plaintiff shows discriminatory intent. *See, e.g.*, *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003) ("[P]rivate individuals may recover compensatory damages under § 504 and Title II only for intentional discrimination."); *Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination."); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147,

1152-53 (10th Cir. 1999) (district court committed reversible error in failing to instruct jury that plaintiff needed to show intentional discrimination to recover compensatory damages); *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998) (holding that "compensatory damages are not available under Title II or § 504 absent a showing of discriminatory intent"); *Wood v. President and Trustees of Spring Hill Coll. in City of Mobile*, 978 F.2d 1214, 1219-20 (11th Cir. 1992); *Kennington v. Carter*, No. IP02-0648-C-T/K, 2004 WL 2137652, at *7 (S.D. Ind. June 28, 2004) ("Proof of intentional discrimination is necessary before a plaintiff may recover compensatory damages under Title II of the ADA."); *Access Living of Metro. Chicago v. Chicago Transit Auth.*, No. 00 C 0770, 2001 WL 492473, at *6 (N.D. Ill. May 9, 2001). Thus, while the Seventh Circuit has never squarely addressed the question, the weight of authority clearly suggests that compensatory damages are available under the ADA in the absence of intentional discrimination.

The plaintiffs' ADA claim remains viable, however, because even though they mistakenly claim that it is unnecessary to show intentional discrimination, they have correctly asserted that the record contains sufficient evidence from which intentional discrimination can be inferred. *See* Pls.' Resp. Br. at 13; Pls.' Reply Br. at 14. The issue is complicated by the fact that the precise standard for showing "intentional discrimination" in the

ADA context remains somewhat ill-defined.  The defendants contend that intentional discrimination is shown by showing deliberate indifference.  There is some case authority to support this view. *See, e.g.*, *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001) (adopting the "deliberate indifference" standard over the "discriminatory animus" standard); *Bartlett v. New York State Bd. of Law Exam'rs*, 156 F.3d 321, 331 (2d Cir. 1998) ("In the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will.  Rather, intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy . . . or custom.") (citations, brackets, and quotation marks omitted), *rev'd on other grounds by*, 527 U.S. 1031 (1999); *Powers*, 184 F.3d at 1153 ("We agree with the course charted by our sister circuits and hold that entitlement to compensatory damages under section 504 of the Rehabilitation Act requires proof the defendant has intentionally discriminated against the plaintiff.  Further, intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."); *Kennington*, 2004 WL 2137652, at *7 ("Though the Seventh Circuit has not addressed the issue, several

-36-

circuits have held that the appropriate test for intentional discrimination is the 'deliberate indifference' standard.").

Even assuming the defendants' deliberate indifference standard applies, however, the plaintiffs have adduced enough evidence to survive summary judgment on the issue of intentional discrimination. Deliberate indifference "can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers*, 184 F.3d at 1153; *see also Duvall*, 260 F.3d at 1139 ("Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood."); *Kennington*, 2004 WL 2137652, at *7.

The defendants assert that they were not deliberately indifferent because they attempted to accommodate the plaintiffs by providing them with shower chairs. The defendants claim that the plaintiffs rejected the chairs simply because they were unfamiliar with them or wanted better ones. Thus, for example, the defendants cite Colette Connolly's remark that "some of the patients that have been disabled for many years, they have custom chairs at home . . . and they have all the bells and whistles that make it easy for them." Defs.' L.R. 56.1 Stmt. As the County claims, "the Defendants provided shower chairs, and although they were not the

-37-

precise chairs sought by the inmates, there is no authority mandating that they must be." County's Br. at 11.

This argument is unconvincing. As an initial matter, the argument addresses only the issue of shower chairs. The defendants are silent concerning the plaintiffs' other requested accommodations, such as grab bars and accessible sinks. Thus, even if the defendants were correct in claiming that they were not deliberately indifferent to the plaintiffs' need for shower chairs, they would not be entitled to summary judgment with respect to all of the issues in the case. Moreover, even with respect to the matter of the shower chairs, the defendants are unable to show that they were not deliberately indifferent as a matter of law. As a factual matter, it is unclear whether the shower chairs were inadequate or whether they simply were not to the plaintiffs' liking.

Importantly, the fact that the defendants may have thought that the chairs were an adequate accommodation does not preclude a finding of deliberate indifference on their part. This can be seen in *Love v. Westville Corr. Cent.*, 103 F.3d 558 (7th Cir. 1996), one of the few cases in which the Seventh Circuit has addressed the issue of deliberate indifference in the context of an ADA case involving prison conditions. The plaintiff in *Love* was a quadriplegic incarcerated in Westville Correctional Center in Indiana ("WCC"). *Id.* at 558. He claimed that the prison had

-38-

violated the ADA by failing to provide him with access to various programs and activities. *Id.* at 558-59. A jury concluded that while the WCC had violated Love's rights, the violation had not been intentional. *Id.* at 559. Love moved for a new trial.

In granting the motion, the district court stated, "[t]he jury found that WCC discriminated against Mr. Love, and the record is absolutely devoid of any evidence that would support a finding that discrimination was not intentional." *Love v. McBride*, 896 F. Supp. 808, 809 (N.D. Ind. 1995)). The district court also stated:

> WCC knew that it was not providing Mr. Love full access to services, programs, and activities, knew that Mr. Love's disability was the reason he was not receiving full access to those programs, knew that Mr. Love repeatedly requested access, knew that WCC had a legal duty to provide Mr. Love with reasonable access, and knew that Mr. Love had a right to reasonable access. WCC may not have known that the access they were affording Mr. Love was unreasonable, but . . . WCC voluntarily and deliberately denied Mr. Love's requests for greater access to the programs, and did so because of this known disability, not because of mistake, accident, negligence, or another innocent reason. Mr. Love was not required to prove anything more to establish that the discrimination (a separate issue) was intentional.

*Id.* at 810.

The WCC appealed, arguing, among other things, that they had not intentionally discriminated against Love. The Seventh Circuit rejected the claim, holding: "[t]he record at the first trial amply supports the trial judge's conclusion on the motion for new trial that Westville indeed committed 'intentional' discrimination

-39-

against Love.  Its specific knowledge of the ADA's reasonable accommodation requirement is legally irrelevant to this finding." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996).

The same reasoning applies here: the defendants were aware that the plaintiffs had a right to reasonable access to showers, toilets, and sinks, and the defendants refused to provide the accommodations suggested by the plaintiffs.  The fact that the defendants might have believed that they were providing the plaintiffs with reasonable access is beside the point.  If the requested modifications were reasonable, the defendants could be found to have acted with deliberate indifference.

None of this is to say that the requested accommodations were in fact reasonable or that the plaintiffs were treated in a discriminatory fashion.  It is only to say that if the plaintiffs were treated discriminatorily, a jury could reasonably find that the discrimination was "intentional" for purposes of the ADA. Thus, I conclude that the plaintiffs have asserted "intentional discrimination" within the meaning of the ADA, and that as a result, they may be awarded compensatory damages if they prevail.

**F.   Reasonableness of the Requested modifications**

Having rejected the defendants' other arguments, the question central to the plaintiffs' ADA claim becomes whether the modifications to the prison facilities requested by the plaintiffs

were reasonable.  As noted above, Title II's central implementing regulation provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."  28 C.F.R. § 35.130(b)(7).  However, the implementing regulations further clarify that the strictness of Title II's requirements varies depending on the age of the facility in question.  The Supreme Court has summarized the basic regulatory framework in this way:

> Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs.  It requires only "reasonable modifications" that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service. As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways. In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards.  28 CFR § 35.151 (2003).  But in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services.  § 35.150(b)(1).  Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes.  *Ibid.*  And in no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a

> fundamental alteration in the nature of the service.  §§
> 35.150(a)(2),  (a)(3).

*Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004); *see also Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002).

Moreover, the Seventh Circuit has stated that determining the reasonableness of a particular accommodation entails a highly fact-specific inquiry:

> Whether a requested accommodation is reasonable is highly
> fact-specific, and determined on a case-by-case basis by
> balancing the cost to the defendant and the benefit to
> the plaintiff.  Whether the requested accommodation is
> necessary requires a showing that the desired
> accommodation will affirmatively enhance a disabled
> plaintiff's quality of life by ameliorating the effects
> of the disability. The overall focus should be on whether
> waiver of the rule in the particular case at hand would
> be so at odds with the purposes behind the rule that it
> would be a fundamental and unreasonable change.

*Dadian v. Village of Wilmette*, 269 F.3d 831, 838-39 (7th Cir. 2001) (citations and quotation marks omitted).

The inquiry is somewhat more complex when considering Title II claims in the prison context.  Many courts have held that in such cases, the reasonableness inquiry should apply the factors discussed in the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78 (1987).  *See, e.g.*, *Kutrip v. City of St. Louis*, 329 Fed. App'x. 683, 684 (8th Cir. 2009); *Pierce v. County of Orange*, 526 F.3d 1190, 1216 (9th Cir. 2008).  In *Turner*, the Court singled out

four factors to be considered in assessing the constitutionality of restrictions on prisoners' rights: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to the prisoners; (3) the impact that accommodation of the prisoner's alleged constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether "there is a ready alternative to the policy 'that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests,'" *See. e.g.*, *Russell v. Richards*, 384 F.3d 444, 447 (7th Cir. 2004) (quoting *Turner*, 482 U.S. at 90).

The Seventh Circuit has yet to address the question whether the *Turner* factors should be applied in prison-condition cases brought under the ADA. But it is not necessary to decide the issue here, because even assuming that the *Turner* standard applies, a triable issue of fact remains as to whether the accommodations cited by the plaintiffs are reasonable.[12]

To begin with, it is important to note that the defendants do not claim that the plaintiffs were provided with their requested

---

[12] *Turner* requires substantial deference to prison officials. state prison officials. *See, e.g.*, *Beard v. Banks*, 548 U.S. 521, 528 (2006). Thus, if the defendants are not entitled to summary judgment under that standard, they would not be able to prevail under another standard. In any case, the defendants themselves argue that *Turner* applies here.

accommodations.  As noted above, it is true that the defendants provided the plaintiffs with shower chairs in at least some cases. However, a factual question remains as to adequacy of the chairs. While the plaintiffs cite evidence indicating that chairs were unsatisfactory, *see* Pls.' L.R. 56.1(b) Stmt. ¶ 59, the defendants maintain that the plaintiffs simply did not like the chairs, see Defs.' Rule 56.1 Stmt. ¶ 34.  In any event, the shower chair represents only a single accommodation, leaving unaddressed the plaintiffs' complaints regarding their inability to use the sink or the toilet.  Indeed, the shower chairs did not even fully address the plaintiffs' complaints about the showers.  For, in addition to shower chairs, the plaintiffs also complained about the height of the soap dispenser, as well as the placement of shower nozzles and other shower controls.  The defendants make no claim to have addressed any of these concerns.

It is also true that portions of the defendants' 56.1 Statements imply, or in some cases dogmatically assert, that certain parts of the CCDC were in compliance with the ADA.  *See, e.g.*, Defs.' L.R. 56.1(b) Stmt. § 27 (asserting that the RTU is equipped with grab bars and shower chairs); ¶ 30 (stating that "Cermak has handicapped accessible rooms that are equipped with handicap toilets and sinks located on 3 North and 3 West); ¶ 45 (stating that "[i]nmates were able to use the sinks to wash their hands.").  But, with the exception of Statement 30, these claims

are disputed by the plaintiffs.  *See* Pls'. L.R. 56.1(b) Stmt. ¶¶ 27, 45.  Moreover, even if all of these issues were undisputed, that still would not suffice to show that the CCDC's accommodations were adequate for purposes of the ADA.  These address only parts of the CCDC and are not responsive to all of the areas where the plaintiffs allege that access was lacking.

Nor do the defendants appeal to concerns over cost to justify their refusal to make the modifications in question.  Instead, the defendants claim that accommodating the plaintiffs would have posed a threat to prison safety.  Specifically, the Sheriff claims that he "concluded that forbidding items that could be transformed into weapons fosters correctional security."  Sheriff's Br. at 14.

This argument raises far too many disputed questions of fact to serve as a basis for summary judgment.  For example, the plaintiffs dispute the claim that the Sheriff ever made an actual assessment of the safety concerns raised by the requested accommodations.  *See* Pls.' Stmt. Add'l Facts ¶ 9. More importantly, even assuming that the Sheriff made a safety evaluation, a factual question remains concerning the reasonableness of the Sheriff's determination that making the accommodations would have posed a threat to prison safety.  Even under the deferential *Turner* standard it would be possible for a reasonable jury to find that the Sheriff's concern about, say, grab rails, was not a reasonable basis for refusing to install them.  The Sheriff suggests that

-45-

prisoners might fashion weapons out of grab rails, *see* Sheriff's Resp. Br. at 7-9; but since these are presumably embedded in the prison walls, it might be doubted whether making this modification would really present any danger.  Nor does the Sheriff explain how adjusting the height of toilets, sinks, shower controls, and soap dispensers in the shower might compromise prison safety.  The defendants' appeal to concerns over prison safety are perhaps also difficult to reconcile with the fact that the defendants were provided with shower chairs.  If the Sheriff determined that shower chairs did not pose a threat to prison safety, a jury might reasonably wonder why the installation of grab rails should have been deemed a threat.

Finally, it should be noted that none of the defendants' arguments addresses accommodations at Cermak.  Thus, even if the defendants were entitled to summary judgment insofar as the RTU was concerned, it would not follow that they were entitled to summary judgment with respect to the plaintiffs' complaints about Cermak. Indeed, the case for summary judgment is even more difficult in connection with Cermak since it was built after the ADA's passage. As a result, Cermak is subject to the requirements of 28 C.F.R. § 35.151, which are more stringent than those to which the RTU is subject as a structure built prior to the ADA.

**G.   The Plaintiffs' Motion for Summary Judgment**

The foregoing discussion shows that disputed issues of fact remain concerning the reasonableness of the requested modifications to the Prison's facilities.  This conclusion precludes summary judgment in the plaintiffs' favor as much as it precludes summary judgment in favor of the defendants.  For completeness, however, I examine the plaintiffs' chief argument in support of their motion for summary judgment.  The argument centers on the standards set forth in the Americans with Disabilities Act Accessibility [sic] Guidelines for Buildings and Facilities ("ADAAG"), 28 C.F.R. pt. 36 app. A, and the Uniform Federal Accessibility Standards ("UFAS"), 41 C.F.R. part 101-19.6, Appendix A.  The ADA's implementing regulations provide that "any part of a public entity's facility constructed after January 26, 1992 must be designed and constructed in conformance with the Uniform Federal Accessibility Standards or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities." *Pierce v. County of Orange*, 526 F.3d 1190, 1216 (9th Cir. 2008)(citations and quotation marks omitted).  These guidelines specify in great detail the proper height for toilets, sinks, and showers, and set forth a wide range of additional accessibility standards necessary for compliance with the ADA.  The plaintiffs have submitted several reports authored by their expert, Ken Schoonover, that compare various areas of the CCDC against these standards.  *See* Pls.' Exhibits 10-12.  The

reports identify many areas and facilities that fall short of both the ADAAG and the UFAS.

In response, the Sheriff notes that these standards apply only to newly constructed buildings and those that have undergone recent alteration. As a result, the guidelines are inapplicable to the RTU, which was built in the 1980s. Furthermore, the Sheriff argues that the standards do not apply to Cermak because Title II's Technical Assistance Manual states that the ADAAG's standards do not apply to correctional facilities. This leaves only the UFAS's standards, and their application only to Cermak.

Even here, however, factual disagreements persist. For example, the plaintiffs argue that the CCDC fails to comply with a UFAS regulation which requires the accessibility of "5 percent of residential units available, or at least one unit, whichever is greater; [and of] all common use, visitor use, or areas which may result in employment of physically handicapped persons." UFAS § 4.1.3(9). The defendants respond that § 4.1.3(9) does not apply to Cermak because Cermak's units consist of hospital rooms, not prison cells. Moreover, the defendants observe that certain portions of Cermak are maintained as dormitories and have no individual rooms or cells. In these areas, it is unclear whether, or in what way, § 4.1.3(9) applies. The defendants further contend that certain of the dorms are equipped with thirty beds, and that in these dorms, ten of the beds are accessible. As a result, they claim, §

4.1.3(9)'s five percent requirement is met. While these considerations and back-of-the-envelope calculations are hardly definitive, they are sufficient to raise a question of fact as to whether UFAS standards should be applied to Cermak under these circumstances. This is especially so given the plaintiffs' failure to make any rejoinder to these arguments.

In sum, both the plaintiffs' and the defendants' motions for summary judgment on the plaintiffs' ADA claim are denied.

## VI.  Electronic Monitoring & Drug Rehabilitation Programs

In addition to their claims concerning access to shower, toilet, and lavatory facilities, the plaintiffs' complaint also alleges that certain of the plaintiffs were excluded from an electronic monitoring program and a drug rehabilitation program run by the CCDC. The Sheriff briefly argues that the plaintiffs' exclusion from these programs was unrelated their disabilities. For example, the Sheriff claims that House's participation in the electronic monitoring program was denied not because he was confined to a wheelchair but because of his criminal history. Similarly, the Sheriff claims that Phipps was never denied access to the Prison's drug rehabilitation program, but instead was not included because he never gave any indication that he suffered from drug dependency.

In their briefing on the summary judgment motions, the plaintiffs almost completely ignore their claims relating to these programs. Rather than advancing arguments or evidence of their own, they merely assert that the Sheriff has failed to adduce any admissible evidence in support of his arguments that the plaintiffs were not wrongfully excluded from the programs. Indeed, the plaintiffs conclude that, as a result of this alleged failure, they are entitled to summary judgment with respect to this claims.

This represents a misunderstanding of the parties' relative burdens of proof. The claims in question are asserted by the plaintiffs. At trial, therefore, the plaintiffs would obviously bear the burden of showing that they were excluded from the programs for discriminatory reasons. *See, e.g.*, *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 672 (7th Cir. 2000). Accordingly, the plaintiffs have the same burden as the party moving for summary judgment: they cannot simply fall back on the defendants' alleged failure to show that they did not engage in discrimination. Rather, the plaintiffs must "establish affirmatively the lack of sufficient evidence favoring the nonmoving party." *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir. 2004) (quotation marks omitted).

The plaintiffs have not even attempted to make the necessary showing here. Accordingly, I deny their motion for summary

judgment insofar as it relates to the electronic monitoring and drug rehabilitation programs.

### VII.

For the reasons explained above, the parties' motions for summary judgment are denied.


ENTER ORDER:

**Elaine E. Bucklo**
United States District Judge


Dated:  November 25, 2009